UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GLORIA SHALDERS,

      Plaintiff,

v.

DEPARTMENT OF CHILDREN AND
FAMILIES, REBECCA STAFFORD SYKES,     No. 22-cv-12231-NMG
KEVIN WALLACE, PHILIP JAMES
CLOSSEY, SHANNON McANULTY,
JENNIFER MELIA, PENNY WELCH,
AMANDA CARPE, and JOHN DOES 1-10,

      Defendants.

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS TO DISMISS**

CABELL, U.S.M.J.

## I.   INTRODUCTION

Plaintiff Gloria Shalders ("Shalders") has brought a multi-count action against several entities for their allegedly improper conduct in a state investigation and family court action regarding the well-being and custody of Shalders's then-minor children, including Shalders's own retained counsel Amanda Carpe, state court probation officer Penny Welch, and several employees of the Massachusetts Department of Children and Families (DCF) (the "DCF defendants") (collectively, "the defendants"). The defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that it fails to assert a valid

claim for relief.[1]  For the reasons that follow, the court agrees and recommends that the defendants' motions to dismiss be granted.

## II.  FACTUAL BACKGROUND

The court takes the following facts from the amended complaint except where otherwise noted and accepts the facts as true for purposes of the motions to dismiss, drawing all reasonable inferences from those facts in Shalders's favor. *See Skoly v. McKee*, 103 F.4th 74, 80 (1st Cir. 2024).

In December 2018, Shalders and her children were evicted from their residence in Texas and relocated to Worcester, Massachusetts to reside with family.  (D. 39, Amended Complaint, ¶¶ 11).  Beginning on February 22, 2019, Shalders was involuntarily committed to the Psychiatric Treatment and Recovery Center at UMass Memorial Medical Center based on a report made by Shalders's estranged parents.  (*Id.* at ¶ 12).  Shalders was released on March 13, 2019, but would go on to be civilly committed at least two more times by May 2020.  (*Id.* at ¶¶ 12-13, 67).

---

[1] All defendants (save for Carpe) also purport to reserve the right to move to dismiss the amended complaint for insufficient service of process under Federal Rule of Civil Procedure 12(b)(5) should the court not grant their pending motion to dismiss.  (D. 38, Memorandum in Support of Motion to Dismiss, p. 14).  However, a party that fails to raise a defense of insufficient service of process in its initial motion to dismiss or responsive pleading is deemed to have waived that defense.  Fed. R. Civ. P. 12(g)(2), (h)(1)(A).  Allowing a party to file a subsequent motion to dismiss based on a defense briefly mentioned in an earlier motion would fly in the face of the rule, which requires a party to raise all its defenses at once when possible.  Fed. R. Civ. P. 12(g); *see Yancey v. Warden, FMC Devens*, 682 F. Supp. 3d 97, 101 n.3 (D. Mass. 2023) (finding respondent waived certain defenses by failing to raise them in its initial motion to dismiss).

On January 8, 2020, Shalders's parents filed petitions with the Worcester Probate and Family Court ("Family Court") to be appointed guardians of Shalders's children. *See* Petition, *In the matter of: Shalders, Esmerelda*, No. WO20P0079GD (Mass. Prob. Fam. Ct. Jan. 08, 2020); Petition, *In the matter of: Shalders, Jesse*, No. WO20P0080GD (Mass. Prob. Fam. Ct. Jan. 08, 2020); Petition, *In the matter of: Fosu, Joel Kwesi*, No. WO20P0082GD (Mass. Prob. Fam. Ct. Jan. 08, 2020).[2] No one notified Shalders about the petitions. (D. 39, ¶ 37).

Shalders had civil commitment hearings in January, February, and May 2020. (*Id.* at ¶ 67). Defendant Rebecca Sykes ("Sykes"), a social worker with the Massachusetts Department of Children and Families ("DCF"), attended those hearings. (*Id.*).[3] At the May hearing, Sykes advocated against releasing Shalders, asserting that Shalders would not take her medications if released. (*Id.* at ¶ 69). Sykes also asked the court to issue a supervised visitation order as to Shalders's children if Shalders were to be released.

---

[2] When faced with a motion to dismiss, the court typically "consider[s] only the 'facts alleged in the complaint, and the exhibits attached thereto.'" *Newman v. Lehman Brothers Holdings Inc.*, 901 F.3d 19, 25 (1st Cir. 2018) (quoting *Freeman v. Town of Hudson*, 714 F.3d 29, 35 (1st Cir. 2013)). However, "[a] court may consider matters of public record in resolving a Rule 12(b)(6) motion to dismiss[, . . .] includ[ing] documents from prior state court adjudications." *Giragosian v. Ryan*, 547 F.3d 59, 66 (1st Cir. 2008) (internal quotation marks and citations omitted).

[3] The amended complaint refers to Sykes variously as "Rebecca," "Sykes," "Rebecca Stafford," and "Rebecca Stafford Sykes."

(*Id.*).   The court disagreed with Sykes and ordered Shalders released.  (*Id.* at ¶ 70).

Subsequently, on June 15, 2020, Sykes sent Shalders the following text message: "All contact between [Shalders] and her children be supervised by a third party approved by the Department[.]  The Department of Children and Families is not recommending you have any unsupervised contact with your children until we can further assess your stability and your engagement in mental health treatment."  (*Id.* at ¶ 18).

Shalders and her husband visited the Family Court in July 2020 to inquire about DCF's supposed supervised visitation requirement.  (*Id.* at ¶ 23).  To their surprise, they received a notice indicating that there would be a custody hearing regarding their children on August 31, 2020, apparently based on guardianship petitions filed by Shalders's estranged parents, and that the court had appointed counsel to represent them.  (*Id.*).  None of the documents Shalders received reflected that DCF was involved in the guardianship actions.  (*Id.* at ¶ 24).  The court later postponed the custody hearing.  (*Id.* at ¶ 32).

On September 23, 2020, Shalders retained an attorney, defendant Amanda Carpe ("Carpe"), to represent her in the guardianship actions.  Carpe's representation of Shalders was brief and lasted for just over four months.  Order on Motion to Withdraw, *In the matter of: Shalders, Esmerelda*, No. WO20P0079GD

(Mass. Prob. Fam. Ct. Jan. 25, 2021).  At a hearing on that same date, the court instructed Shalders and her husband to find a friend to accompany them when visiting their children, but the court allegedly later amended its order and directed that "Christine Peluso . . . from the [s]upervised visitation network" should supervise the visits. (D. 39 ¶¶ 35, 43).

Shalders found Carpe's advocacy at the hearing and afterwards to be lacking.  (*Id.* at ¶¶ 35-36, 47-51).  Subsequently, Carpe allegedly misrepresented to DCF that Shalders and her husband had found someone from the "supervised visitation network" to supervise their visits with their children, worsening Shalders's situation.  (D. 39, ¶ 45).  On October 23, 2020, Carpe sent Shalders an email advising Shalders that she "should meet with DCF at least once" to clear up any concerns DCF had about Shalders based on allegedly false information provided by Shalders's parents.  (D. 1-3, Exhibits to Complaint, p. 2).[4]  Carpe warned Shalders that her failure to meet with DCF would "almost certainly guarantee" that Shalders's parents would become her children's permanent guardians.  (*Id.*).  Shalders responded by email on November 29, 2020, instructing Carpe to withdraw from the case "ASAP."  (*Id.* at

---

[4] The court notes that the plaintiff attached these emails to her original complaint but not to her amended complaint, which is currently the operative complaint in this case.  Nonetheless, the court considers the emails here because they are sufficiently referred to in the amended complaint, (D. 39, ¶¶ 56-57), and the parties do not dispute their authenticity.  *See Freeman v. Town of Hudson*, 714 F.3d 29, 36 (1st Cir. 2013).

p. 3).   In a subsequent email, Shalders told Carpe: "As far as I am concerned, you [ceas]ed to be my Attorney on 11/29/2020." (*Id.* at p. 4).

Shalders and her husband represented themselves at a further hearing on January 25, 2021.   (*Id.* at ¶ 78).   At the hearing, Shalders informed the Family Court that her parents had fraudulently prosecuted the guardianship actions while preventing her husband from seeing the children, and while also illicitly receiving government funds intended for Shalders.   (*Id.* at ¶¶ 78-80, 87).   The court ordered defendant Penny Welch ("Welch"), a probation officer, to investigate, allegedly in response to Shalders's allegations.   (*Id.* at ¶¶ 80-81).

Welch investigated by videotaping Shalders's home via Zoom, requesting a release of several categories of records pertaining to Shalders and her children, running CORI checks on Shalders, her husband, and her children, and obtaining unspecified police reports from the Worcester Police Department and the Norwood Police Department.   (*Id.* at ¶¶ 82-83, 88-89).   After concluding her investigation, Welch compiled a report in which she suggested that Shalders had a severe mental illness and that the children should remain with their grandparents.   (*Id.* at ¶ 84).   The report concluded that Shalders had a severe mental illness even though it also acknowledged that Welch was unable to obtain Shalders's medical records.   (*Id.*).

On June 20, 2021, Sykes and defendant Kevin Wallace ("Wallace"), another DCF social worker, contacted Shalders's friend Dorothy, who was the third party Shalders and her husband had found to supervise their visits with their children.[5]  (*Id.* at ¶ 73).  Wallace allegedly misrepresented himself to Dorothy as Shalders's attorney.  (*Id.*; D. 1-3, pp. 8-12).  Shalders alleges that Sykes and Wallace attempted to interfere with her and her husband's ability to visit their children.[6]

The court convened a trial on the guardianship petitions on October 7 and 8, 2021.  (D. 39, ¶ 90).  Sykes and other unnamed "DCF staff" testified as witnesses on behalf of Shalders's parents. (*Id.* at ¶ 93).  The court found in favor of Shalders and her spouse and returned custody of the children to them.  (*Id.* at ¶ 90).

A few days after the hearing, on October 12, 2021, Sykes came unannounced to Shalders's home.  (*Id.* at ¶ 93).  Sykes searched the home, looking in all the rooms and inside the refrigerator. (*Id.*).  Shalders asserts that Sykes did not have a warrant to search her home and that Shalders and her husband "had no case with DCF."  (*Id.* at ¶¶ 93-94).

---

[5] Dorothy's last name does not appear in the record.

[6] Text messages attached to the original complaint indicate that Sykes emailed Dorothy to inform her that the court had directed Shalders's parents "not to start visitation with [Dorothy] as a supervisor" because Dorothy was not a professional vetted through the supervised visitation network.  (D. 1-3, p. 10).

On October 15, 2021, Sykes and other DCF personnel returned to the home and demanded that Shalders execute releases for information from her doctors and employer, as well as from her children's school and their pediatricians. (*Id.* at ¶ 95). Shalders complied. (*Id.*). Sykes told Shalders that she and her team would be coming to the home every week to supervise Shalders, her husband, and her children to ensure the children's wellbeing. (*Id.* at ¶ 97). Sykes also said that Shalders "had to commit to [a] DCF Family Action Plan and get treatment for [her] alleged mental illness." (*Id.* at ¶ 98).

In March 2022, Sykes transferred the matter to DCF's Arlington office, at which point defendants Philip James Clossey ("Clossey") and Shannon McAnulty ("McAnulty") began supervising Shalders and her children. (*Id.* at ¶ 101). Clossey and McAnulty continued to "harass, coerce, stress, and argue with" Shalders about her need to comply with the DCF action plan. (*Id.* at ¶ 102). Clossey, McAnulty, and another, unnamed DCF worker visited Shalders's home every week. (*Id.*). When Clossey and McAnulty came to the home, they searched the "refrigerator, bathroom, and the children's room without a warrant." (*Id.* at ¶ 103).

On April 22, 2022, Shalders called the Worcester DCF office to request all DCF records relating to her. (*Id.* at ¶ 104). During that phone call, Shalders learned that DCF records showed that her case had been closed in March 2020 and reopened in the

Arlington office in March 2022. (*Id.*). DCF mailed the records to Shalders at her request, but half of them were redacted. (*Id.*).

## III. PROCEDURAL BACKGROUND

Shalders filed this action on December 30, 2022. (D. 1). Carpe filed a motion to dismiss the original complaint on April 14, 2023, (D. 18), while the other defendants filed a similar motion on April 28, 2023, (D. 20). Shalders filed late oppositions to both motions, (D. 22; D. 23), before filing a purported first amended complaint, (D. 25). The court struck that complaint for failure to comply with Federal Rule of Civil Procedure 15(a). (D. 26). Shalders subsequently sought leave to file an amended complaint. (D. 30). The court granted Shalders leave to file an amended complaint but dismissed all claims against DCF and Judge Jennifer Melia ("Judge Melia") of the Family Court. (D. 34).

Having now obtained leave, Shalders filed the amended complaint on November 14, 2023, making it the operative complaint for purposes of the motions to dismiss. (D. 39). Welch and the DCF defendants filed a motion to dismiss on December 5, 2023. (D. 37). Carpe filed her own motion to dismiss on December 14, 2023. (D. 41). Shalders has opposed both motions. (D. 43; D. 44).

Separately, on November 29, 2023, Shalders filed a motion asking the court to reconsider its order dismissing DCF and Judge Melia from the case. (D. 36). The court denied that motion on December 7, 2023. (D. 40). Thus, to the extent the amended

complaint purports to assert any claims against DCF or Judge Melia, this court treats those claims as having already been dismissed and does address them here.

## IV. LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also McEntee v. Beth Israel Lahey Health, Inc.*, 685 F. Supp. 3d 43, 48 (D. Mass. 2023) (complaint must state a claim that is "actionable as a matter of law").  A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can draw the reasonable inference that the defendants are liable for the misconduct alleged.  *Ocasio-Hernandez v. Fortuna-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).  For purposes of resolving a motion to dismiss, the court credits all factual allegations in the operative complaint but not "'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl.*, 550 U.S. at 555, 557) (alteration in original).

The normal standards for a motion to dismiss are relaxed somewhat when evaluating a pro se plaintiff's complaint.  "A document filed *pro se* is 'to be liberally construed,' and 'a *pro*

*se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citation omitted) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "However, pro se status does not insulate a party from complying with procedural and substantive law." *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997) (citing *Eagle Eye Fishing Corp. v. United States Dep't of Com.*, 20 F.3d 503, 506 (1st Cir. 1994)).

## V.  DISCUSSION

The amended complaint asserts 14 claims: Deprivation of Rights Under Color of State Law (Count I); Abuse of Process (Count II); Civil Harassment (Count III); 14th Amendment Infringement on Human Liberty (Count IV); Unreasonable Search of Home (Count V); Willful and Wrongful Conduct (Count VI); Emotional Distress (Count VII); Violation of Parental Rights (Count VIII); Breach of Fiduciary Duty (Count IX); False Light Invasion of Privacy (Count X); Fraud and Deceit (Count XI); Conspiracy (Count XII); Supervisory Liability (Count XIII); and Judicial Misconduct and Criminal Behavior (Count XIV).[7]

Five of the claims arguably assert federal claims that "aris[e] under the Constitution, laws, or treaties of the United States," including Counts I, IV, V, VIII, and XIII, see 28 U.S.C.

---

[7] Count XIV is only asserted against Judge Melia.  As described above, the court has already dismissed all claims against Judge Melia, and so Count XIV is effectively inoperative.

§ 1331, but the others are premised on violations of Massachusetts state law. Because the court's jurisdiction in this case is premised on the existence of a federal question, (D. 39, ¶ 4), and a determination regarding the viability of those claims could obviate the need to address the state claims, the court begins by considering the viability of the federal claims.

### A.    Interference with Parental Rights (Counts I, IV, and VIII)

Counts I, IV, and VIII are all captioned differently but each asserts essentially the same claim, namely that the defendants violated Shalders's fundamental right to parent her children as secured by the Fourteenth Amendment's Due Process Clause. The court for that reason groups these three counts together in discussing their viability.

As an initial matter, "a litigant complaining of a violation of a constitutional right does not have a direct cause of action under the United States Constitution but must utilize 42 U.S.C. § 1983." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 20001). "Section 1983 provides 'a method for vindicating federal rights elsewhere conferred,' but [it] does not independently confer any substantive rights." *McEntee*, 685 F. Supp. 3d at 50 (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)). To proceed under Section 1983, a plaintiff must allege facts sufficient to show that the defendant (1) acted under color

of state law and (2) deprived the plaintiff of a federal constitutional or statutory right. *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 4 (1st Cir. 2005). "For the defendant to have acted under color of state law, its actions must be 'fairly attributable to the State,' meaning that it must be fair to characterize the defendant as a state actor." *McEntee*, 685 F. Supp. 3d at 50 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

The right at issue here, namely "the interest of parents in the care, custody, and control of their children[,] is perhaps the oldest of the fundamental liberty interests recognized by" the United States Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). At the same time, "the law recognizes that the protection afforded to the parents' interest must be balanced against other valid interests, particularly the best interests of the child and the interest of society in the maturation of children as future citizens." *Hatch v. Dep't for Children, Youth and Their Families*, 274 F.3d 12, 20 (1st Cir. 2001); *see Stanley v. Illinois*, 405 U.S. 645, 652 (1972) (recognizing state's "legitimate interests" in protecting the welfare of minors, including by separating children from parents when necessary).

With this foundation set, the court turns to the allegations against, and the arguments advanced by, each of the defendants.

       1.  *Amanda Carpe*

Carpe is the only defendant who does not work for the Commonwealth of Massachusetts in some capacity. She is a private attorney whom Shalders briefly retained to represent her in the guardianship proceedings. As such, nothing facially suggests that Carpe was a state actor such that she could be a proper defendant under Section 1983.

To be sure, private individuals can act under color of state law when their actions are "fairly attributable to the State." *Lugar*, 457 U.S. at 937. Here, though, Carpe was privately retained and the amended complaint offers no facts to suggest that she ever deviated from that role or in some way acted on behalf of the state. The amended complaint does assert in conclusory fashion that Carpe conspired with DCF to keep Shalders away from her children, (D. 39, ¶ 111), and that Carpe is an "officer[] of the State," (*id.* at ¶ 181), but courts do not credit "naked assertions" like these when resolving a motion to dismiss.[8] *See Iqbal*, 556 U.S. at 678.

---

[8] The amended complaint also alleges that Sykes and Wallace "continued to harass [Shalders] through her Attorney, Amanda R. Carpe, on the [n]eed to adhere to their treatment plan." (D. 39, ¶ 60). This allegation refers to the email Carpe sent to Shalders on October 23, 2020, advising her to meet with DCF. Nothing in that email suggests that Carpe was acting on behalf of Sykes or Wallace or that anyone directed Carpe to send the email. *See Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

In short, the amended complaint fails to plead sufficient facts to establish that Carpe acted under color of state law, and thus fails to meet the threshold requirements of Section 1983. Consequently, Counts I, IV, and VIII should be dismissed as to Carpe.

    2. *Penny Welch*

Unlike Carpe, Welch is unquestionably a state actor, as the allegations against her stem from work she performed as a probation officer. But Welch argues that the nature of her work is precisely why the counts asserted against her should be dismissed, because she enjoys quasi-judicial immunity from liability for tasks she performs on behalf of the Family Court. This court agrees that Welch is entitled to quasi-judicial immunity in this case and that dismissal is thus appropriate.

As the court noted in its order dismissing all claims against Judge Melia, the doctrine of judicial immunity shields judges "from liability for damages for acts committed within their judicial jurisdiction." *Pierson v. Ray*, 386 U.S. 547, 554 (1967). Similarly, "[t]he doctrine of quasi-judicial immunity provides absolute immunity for those who perform tasks that are inextricably intertwined with the judicial function." *Nystedt v. Nigro*, 700 F.3d 25, 30 (1st Cir. 2012). Such tasks include the preparation of reports by probation officers for the use of state courts. *Demoran v. Witt*, 781 F.2d 155, 157 (9th Cir. 1985); *see also Forte*

*v. Sullivan*, 935 F.2d 1, 3 (1st Cir. 1991) (recognizing "general agreement that court officials . . . who act at the behest of a judge or pursuant to a court order are entitled to absolute quasi-judicial immunity from suit as to those actions[.]").

All the allegations made against Welch stem from actions Welch undertook in conducting an investigation ordered by the Family Court.  Shalders acknowledges that the court ordered Welch to perform the investigation and nothing in the amended complaint suggests that anything Welch did somehow fell outside the bounds of that investigation or the court's order.  Thus, because Welch's work in performing the investigation was "inextricably intertwined with the judicial function" and specifically ordered by the court, she is entitled to quasi-judicial immunity.  *See Nystedt*, 700 F.3d at 30; *Forte*, 935 F.2d at 3.  Because that immunity is absolute, Welch cannot be held liable for allegedly interfering with Shalders's fundamental parental rights, and so Counts I, IV, and VIII must fail as applied to her.

　　　3.　*The DCF Defendants*

Sykes, Wallace, Clossey, and McAnulty all clearly acted under color of state law in their roles as DCF social workers.  At the same time, they did not perform any judicial functions, and so they are not entitled to quasi-judicial immunity.  That said, the court finds that they are entitled to a different kind of immunity

based on the facts alleged in the amended complaint, namely qualified immunity.

"Qualified immunity shields public officials from personal liability for 'actions taken while performing discretionary functions.'" *Ciarametaro v. City of Gloucester*, 87 F.4th 83, 87 (1st Cir. 2023) (quoting *Lynch v. City of Boston*, 180 F.3d 1, 13 (1st Cir. 1999)).  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  As such, "a court will grant qualified immunity unless it is 'sufficiently clear that every reasonable officer would [have understood] that what he [was] doing violate[d]' the plaintiff's rights." *Ciarametaro*, 87 F.4th at 88 (quoting *Relchie v. Howards*, 566 U.S. 658, 664 (2012)) (alterations in original).  "[Q]ualified immunity should be resolved at the earliest possible stage of litigation." *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 8 (1st Cir. 2013).

The qualified immunity analysis consists of two prongs.  The first prong asks whether the defendants "violated a federal statutory or constitutional right." *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018).  The second asks whether, assuming *arguendo* the challenged conduct violated a federal right, "the unlawfulness of [the defendants'] conduct was 'clearly established at the time.'" *Id.* at 63 (quoting *Relchie*, 566 U.S. at 664).  For

the unlawfulness of the defendants' conduct to be "clearly established, "existing law must have placed the constitutionality of the [defendants'] conduct 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Courts may consider either of the two prongs first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As discussed above, parents have a fundamental liberty interest in the "care, custody, and control of their children," *Troxel*, 530 U.S. at 65, but that interest "must be balanced against other valid interests, particularly the best interests of the child and the interest of society in the maturation of children as future citizens," *Hatch*, 274 F.3d at 20. Having engaged in this balancing act, other courts in this district have found that DCF workers were entitled to qualified immunity in circumstances similar to those presented here. *See Doe Next Friend of A v. Spears*, 630 F. Supp. 3d 290, 297 (D. Mass. 2022); *Wilmot v. Tracey*, 938 F. Supp. 2d 116, 138-39 (D. Mass. 2013); *Donald M v. Matava*, 668 F. Supp. 703, 711-12 (D. Mass. 1987); *see also Hatch*, 274 F.3d at 25 (finding social worker was entitled to qualified immunity for temporarily removing minor from home because worker had reasonable suspicion that minor was being abused). Those decisions turn in part on the principle that "a case worker must have a fair amount of leeway to act in the interest of an imperiled child." *Hatch*, 274 F.3d at 22.

In this case, the amended complaint is replete with facts demonstrating that the DCF defendants had reasonable concerns about the welfare of Shalders's children.   Shalders was involuntarily committed three times in 2019 and 2020 due to alleged psychiatric concerns.   In January 2020, Shalders's parents petitioned the Family Court for guardianship of the children due to Shalders's alleged mental illness.   On March 13, 2020, the Family Court appointed Shalders's parents as the children's temporary guardians.   Order Appointing Temporary Guardian of a Minor, *In the matter of: Shalders, Esmerelda*, WO20P0079GD (Mass. Prob. Fam. Ct. Mar. 13, 2020).   Welch's report reflected that it was unclear if Shalders could properly care for the children, that her husband had not cared for the children consistently, and that her husband impeded Shalders from receiving treatment for her alleged mental health issues.   (D. 1-3, p. 14).   Finally, Shalders was terminated from two different nursing jobs after relatively short periods of time, in the second instance due to alleged narcotics mismanagement (which, it is noted, Shalders denies). (D. 39, ¶¶ 15-17, 95).

Collectively, these facts more than justified the DCF defendants taking steps to ensure that Shalders's children were receiving appropriate care, even if those steps tended to interfere with Shalders's care, custody, and control of the children.   *See Wilmot*, 938 F. Supp. 2d at 139 ("The fact that the investigation

was not perfect does not rise to the level of a constitutional violation or prevent the DCF's employees from being granted qualified immunity."). The court thus finds that the actions taken by the DCF defendants as part of their ordinary work to ensure the children's welfare, such as visiting the family at home or recommending supervised visitation, did not violate any clearly established constitutional right. It follows that the DCF defendants are entitled to qualified immunity.

To be sure, the amended complaint asserts some discrete allegations against Sykes and Wallace that are not clearly connected to their mandate to ensure the welfare of Shalders's children. The first of these is Sykes's presence and presentation at Shalders's May 2020 civil commitment hearing. Shalders asserts that Sykes had no right to attend the hearing, but this contention has no merit where Sykes was free under Massachusetts law to attend the hearing, as was any member of the public. *See Matter of M.C.*, 115 N.E.3d 546, 549 (Mass. 2019) ("All civil commitment hearings, wherever conducted, must be recorded and operate as open, public proceedings."). To the extent Shalders asserts that Sykes's opposition to her release or her request that the court impose supervised visitation violated her constitutional rights, she fails to explain which rights these acts supposedly violated and this court similarly fails to see how Sykes's requests to the state court violated any of Shalders's constitutional rights, especially

considering that the state court ultimately did not grant the requests.  At a minimum, existing law at the time did not place the constitutionality of Sykes's conduct beyond debate, and Sykes therefore is entitled to qualified immunity for her conduct.  *See Wesby*, 583 U.S. at 63.

As for Wallace, Shalders asserts that he misrepresented himself to Dorothy as Shalders's attorney in an effort to prevent Shalders from seeing her children.[9]  While these allegations are troubling if true, Shalders fails to explain in a non-conclusory fashion how Wallace's alleged misrepresentation to Dorothy interfered with Shalders's ability to see her children or with her parental rights more broadly.  Indeed, a June 16, 2021, email from Wallace to Shalders and others (which was attached to the original complaint) reveals that Wallace was encouraging those involved to take steps to enable Shalders to visit her children sooner.  (D. 1-3, p. 13); *see Clorox Co. P.R. v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").  Thus, nothing in the amended complaint suggests, let alone shows that

---

[9] Subsequent text messages between Shalders and Dorothy, which were attached to the original complaint, show that Wallace sent Dorothy an email several days earlier in which he clearly identified himself as an employee of DCF. (D. 1-3, p. 9).

Wallace violated Shalders's clearly established constitutional rights.  He too is therefore entitled to qualified immunity.

**B.   Unreasonable Search (Count V)**

Shalders alleges that Welch and the DCF defendants separately violated her Fourth Amendment right to be free from unreasonable searches.  The court finds that Count V fails to assert a valid section 1983 claim against either.[10]

1.   *Penny Welch*

While conducting her investigation, Welch purportedly recorded a video call she had with Shalders, which captured footage from the interior of Shalders's home.  She also requested a release from Shalders so that she could obtain various records.  Even assuming that one or both of these actions constitutes a search, and thus implicates Shalders's Fourth Amendment rights, Welch is nonetheless shielded from liability by quasi-judicial immunity because she undertook those acts as part of her court-ordered investigation.  Consequently, Count V should be dismissed as to Welch.  *See Nystedt*, 700 F.3d at 30 ("The doctrine of quasi-judicial immunity provides absolute immunity for those who perform tasks that are inextricably intertwined with the judicial function.").

---

[10] For the reasons explained above, the court treats Count V as being asserted under Section 1983.

2.   *The DCF Defendants*

Shalders asserts that the DCF defendants violated her Fourth Amendment rights by visiting and searching her home on multiple occasions beginning on October 12, 2021.  This assertion suffers from multiple deficiencies.  First, although Shalders has a Fourth Amendment right to be free from unreasonable administrative searches, *Michigan v. Clifford*, 464 U.S. 287, 291 (1984), "there is a substantial question whether warrantless home visits by social workers investigating claims of child abuse violate the Fourth Amendment." *Donald M*, 668 F. Supp. at 709; *see also Wyman v. James*, 400 U.S. 309, 317 (1971) (finding social worker's statutorily mandated home visit did not implicate the Fourth Amendment); *Andrews v. Hickman Cnty.*, 700 F.3d 845, 859 (6th Cir. 2012) (noting that the Supreme Court has not explicitly addressed the question but some circuit courts of appeals have decided that warrantless home entries by social workers implicate the Fourth Amendment).

Second, even assuming a social worker's home visit could implicate the Fourth Amendment, a resident's consent to the home visit would vitiate any constitutional concerns.  *See Pagán-González v. Moreno*, 919 F.3d 582, 590 (1st Cir. 2019) (describing consent exception to Fourth Amendment).  While Shalders was certainly unhappy about the home visits, nowhere in the amended complaint does she suggest that she did not consent to the visits.

*See Wilmot*, 938 F. Supp. 2d at 137-38 (no Fourth Amendment violation where plaintiff's wife consented to DCF employees entering home, even where wife was "shocked by the appearance of the DCF employees"); c*f. Sabey v. Butterfield*, --- F. Supp. 3d ---, 2024 WL 1107867, at *5 (D. Mass. 2024) (finding plaintiffs stated viable Fourth Amendment claim where they alleged that they did not consent to entry of police and DCF workers, entry was by threat of force, and DCF workers did not have reasonable suspicion of child abuse).

Third, even if warrantless home visits by social workers do implicate the Fourth Amendment and the home visits at issue here were nonconsensual, the proposition that such a visit would violate Shalders's Fourth Amendment rights was not clearly established when the DCF defendants visited Shalders's home. *See Wesby*, 583 U.S. at 63 (finding that, for a rule to be "settled law," it must be "dictated by controlling authority or a robust consensus of cases of persuasive authority . . . [and] be clear enough that every reasonable officer would interpret it to establish the particular rule the plaintiff seeks to apply") (internal quotation marks omitted). As far as this court can tell, neither the Supreme Court nor the First Circuit has squarely addressed this issue, meaning there is no controlling authority that establishes a clearly settled rule.

To be sure, even the agreement of just three or four circuits can constitute clearly established law as "a robust consensus of persuasive authority." *Irish v. Fowler*, 979 F.3d 65, 77 (1st Cir. 2020).   However, those circuits must agree such that every reasonable officer would interpret their decisions as establishing a particular rule. *Wesby*, 583 U.S. at 63.   In this context, even those circuits that have held that home visits do implicate the Fourth Amendment have varied on the circumstances under which a warrantless visit might nonetheless be appropriate. *See Andrews*, 700 F.3d at 859-60 (finding Fourth Amendment applies to social workers in the same manner as police officers); *Gates v. Texas Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 420-24 (5th Cir. 2008) (applying Fourth Amendment principles to home entry by mixed group of social workers and deputy sheriffs); *Roska v. Peterson*, 328 F.3d 1230, 1242, 1249-50 (10th Cir. 2003) (recognizing uncertainty in existing circuit case law about the propriety of social workers conducting warrantless searches); *Calabretta v. Floyd*, 189 F.3d 808, 816 (9th Cir. 1999) (declining to decide whether social workers' warrantless entries into homes in other cases might be allowable administrative searches where case at hand involved entry and strip search by social worker and police officer and there was "noteworthy . . . absence of emergency"); *Wildauer v. Frederick Cnty.*, 993 F.2d 369, 372 (4th Cir. 1993) (noting "investigative home visits by social workers

are not subject to the same scrutiny as searches in the criminal context"); *Good v. Dauphin Cnty. Soc. Servs. For Child. and Youth*, 891 F.2d 1087, 1092-94 (3d Cir. 1989) (finding Fourth Amendment implicated where police officer and social worker entered home and conducted strip search of child).  Given the lack of a clear rule arising from the relevant case law and the meaningful factual differences between those cases and this case, the court cannot find that every reasonable social worker in the DCF defendants' position would have understood that the warrantless home visits violated Shalders's Fourth Amendment rights.  The DCF defendants are therefore entitled to qualified immunity.

### C.   Supervisory Liability (Count XIII)

Shalders asserts her final constitutional claim against "all DCF supervisory defendants," alleging that those supervisory defendants are responsible for the violations of her constitutional rights due to their failure to properly train or supervise their subordinates.  Putting aside the fact that Shalders does not specify which of her constitutional rights are at issue in this claim, the claim fails at the outset because nothing in the amended complaint offers any hint as to which of the DCF defendants was allegedly responsible for supervising the others.[11] *See Spears*, 630 F. Supp. 3d at 295 (dismissing due process claim

---

[11] Again, to the extent Shalders asserts this claim against DCF itself, the claim has already been dismissed.

where amended complaint failed to identify which if any of the three defendants allegedly submitted false report). Regardless, because none of the defendants are liable for any alleged constitutional violations for the reasons explained above, there can be no supervisory liability here. *See Carr v. Town of Bourne by Bd. Of Selectmen*, --- F. Supp. 3d ---, 2024 WL 125974, at *5 (D. Mass. 2024) (finding supervisory defendants entitled to summary judgment on constitutional claim where subordinate officers did not violate plaintiff's constitutional rights). For these reasons, Count XIII should be dismissed.

**D.   State Law Claims**

Assuming Counts I, IV, V, VIII, and XIII are dismissed, the remaining claims in this action would be state law claims, meaning the court would need to exercise its supplemental jurisdiction to consider them. The court has an independent obligation to determine whether subject-matter jurisdiction exists and remains appropriate throughout the pendency of an action. *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims." *Rossi v. Gemma*, 489 F.3d 26, 39 (1st Cir. 2007) (internal quotation marks omitted) (alteration in original); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (when federal-law claims drop out

of a case at an early stage, consideration of "the values of judicial economy, convenience, fairness, and comity" counsel that the court should decline to exercise jurisdiction over remaining state-law claims).

Here, although this action has been pending for some time, it is still in its beginning stages.  None of the defendants have yet filed a responsive pleading to the amended complaint, no scheduling order has entered, and the parties have not conducted any discovery.  Consequently, there would be little real progress lost if Shalders were to refile her state law claims in Massachusetts state court.  Thus, the court should decline to exercise supplemental jurisdiction and dismiss Shalders's state law claims without prejudice.

## VI.   CONCLUSION

For the foregoing reasons, the court recommends that the Commonwealth Defendants' Motion to Dismiss Plaintiff's Amended Complaint (D. 37), and the Defendant, Amanda Carpe's Motion to Dismiss Plaintiff's First Amended Complaint (D. 41), both be GRANTED.[12]

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  August 2, 2024

---

[12] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.   The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.   The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.   *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).